Nott, J.,
dissenting:
The legal premises upon which this case should be considered I. think may be stated as follows:
1. The stream for many years before the tunnel was begun constantly and unfailingly overflowed a portion of the claimant’s land and made deposits of sand which the claimant sold, and this product of land and stream yielded the owner an annual income which was never less than $500. Since the sinking of the tunnel shaft the natural conditions of the stream have remained unchanged, and the market or demand for building sand has improved, and it is as certain as anything can be that if the tunnel had never been built the claimant up to the present time — that is to say for the last six years, would have received from the sale of sand the same or a greater annual income than he did before.
2. While the owner was thus receiving a steady income from a natural product of the land and stream, the defendants put the bed of the stream to an extraordinary use; that is, they used it as a dumping ground for rock excavated from the shaft of the tunnel; and they thereby made an extraordinary encroachment upon the channel of the stream by reducing it to less than half of its natural width. This use of the bed of the stream was not an ordinary exercise of riparian right, and the bed of the stream was not so used because it was the bed of a stream, but because it furnished a cheaper dumping ground for waste material than the bank above it.
In my judgment the extraordinary use produced what was practically an extraordinary and unnatural diversion of the water of the stream, not from the claimant’s laid in general, but from that portion of his land which yielded him an income, *47 i. e., the water instead of overflowing his land goes rushing past it, bearing along in suspension the sand which would otherwise be deposited.
It is true that a precedent for such an action as this at common law has not been found in the books; it is true that the deposit of sand and gravel upon agricultural land is an injury and not a benefit; it is true that the freshets which have come in the past with the certainty of seed time and harvest may never come again, that the owners of land may so fortify the banks above that Eock Creek in time of freshet will no longer bring down sand in suspension, and that the damages in such a case are not easy to compute. But it is equally true that for many years before the intrusion of the Government “these deposits” were an unfailing “source of income” to the claimant; that if the Government had kept its hands off his property the deposits would have continued during the last six years at least; and that for the last six years he has suffered a loss of at least $450 a year, which was directly caused by the extraordinary encroachment of the Government upon the bed of the stream.
This destruction of a “source of income” from the natural product of a man’s land and stream I deem, in the words of the statute, a direct injury “in a property right.” The case is, to my mind, clearer than the Well Cases, elaborately argued and deliberately decided at the last term (25 C. Cls. B., 87,329), for there it was largely conjectural whether water flowed from the bottom of a well by a subsurface channel to a tunnel 600 feet distant, while here the cause and the injury are as visible as any damage of which a witness can testify. It is, moreover, easier to compute the value of sand which year after year has had an actual market than the value of water which was never sold and never salable.
The purpose of the statute which is committed to the judicial administration of this court was just and beneficent, Congress intending that no person should be directly injured by the construction of this public work. Under it, if not at common law, I think that this claimant is entitled to recover for the injury he has actually suffered, for the loss he has actually sustained, for the value of a right which the construction of a public work directly destroyed. With this exception I concur in the judgment of the court.